# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF TEXAS
### HOUSTON DIVISION

| | | |
|---|---|---|
| **TONY DEROSA-GRUND** | § | |
| | § | |
| **VS.** | § | **CIVIL ACTION NO. _____** |
| | § | |
| **TIME WARNER INC.; WARNER BROS.** | § | |
| **ENTERTAINMENT INC.; NEW LINE** | § | |
| **PRODUCTIONS, INC.; CHAD HAYES;** | § | |
| **CAREY HAYES; and PETER SAFRAN** | § | |

## PLAINTIFF'S ORIGINAL COMPLAINT

Plaintiff, TONY DEROSA-GRUND ("Plaintiff" or "Mr. DeRosa-Grund"), complains of Defendants, TIME WARNER INC. ("Time Warner"), WARNER BROS. ENTERTAINMENT INC. ("Warner Bros."), NEW LINE PRODUCTIONS, INC. ("New Line"), CHAD HAYES, CAREY HAYES, and PETER SAFRAN (collectively, "Defendants"), jointly and severally, as follows:

### INTRODUCTION

1.       Defendants' unlawfully produced and exploited a feature-length theatrical motion picture entitled "The Conjuring" (hereinafter, the "The Conjuring Film"), a work derived from Plaintiff's original story and treatment entitled "The Conjuring" (hereinafter, the "The Conjuring Treatment"). Defendants produced and distributed The Conjuring Film without first acquiring or licensing the requisite derivative theatrical motion picture and ancillary rights to the "The Conjuring Treatment." To date, the aforementioned productions have generated over a half a billion dollars in revenue for Defendants.

2.       In 2009, an involuntary personal bankruptcy was commenced against Plaintiff in the United States Bankruptcy Court for the Southern District of Texas, Houston Division. At that time, Defendants New Line, Peter Safran, Chad Hayes, and Cary Hayes submitted

themselves to the jurisdiction of the Bankruptcy Court [along with, Evergreen Media Holdings, LLC ("EMG") a non-party to this lawsuit] to participate in a core proceeding.  Specifically, these Defendants petitioned the Bankruptcy Court to: (i) exclude a single intellectual property—i.e., the Perron Family Life Rights (the "Perron Life Rights")—from Plaintiff's bankruptcy estate; (ii) permit Defendants to produce and distribute a theatrical motion picture (i.e., "The Conjuring") based on the Perron Family Life Rights under terms approved by the Bankruptcy Court; and, (iii) produce subsequent productions to the initial The Conjuring Film.  The Bankruptcy Court did, in fact, exclude the Perron Life Rights from the bankruptcy estate, and allowed the transfer of such rights to Defendants through a deal memo delineating the material financial terms between EMG, New Line, Mr. Safran, Chad Hayes, and Cary Hayes.  No material financial terms for the Plaintiff are contained in the deal memo, or in the order approving same from the Bankruptcy Court. Plaintiff is a signatory to the deal memo solely to evidence his acquiescence of the exclusion of the Perron Life Rights from his bankruptcy estate.  At no time did Defendants: (i) negotiate with the Trustee to exclude Plaintiff's The Conjuring Treatment from the bankruptcy estate; like Defendants did with the Perron Family rights; (ii) move the Bankruptcy Court to exclude Plaintiff's The Conjuring Treatment from the bankruptcy estate, like Defendants did with the Perron Family rights; or (iii) request that the Bankruptcy Court transfer Plaintiff's The Conjuring Treatment from Mr. DeRosa-Grund's bankruptcy estate to the Defendants.

3.     Defendants engaged in the conduct alleged herein, notwithstanding that their businesses are based upon the value and enforcement of copyrights and other intellectual property.

4.     As set forth in this Complaint, this is an action for copyright infringement (17 U.S.C. §§ 101 *et seq.*), violation of the Lanham Act (15 U.S.C. §§ 1117 and 1125), violation of Texas common law, declaratory relief, and injunctive relief.

## PARTIES

5.     Plaintiff Tony DeRosa-Grund is an individual residing in Montgomery County, State of Texas.

6.     Defendant Peter Safran is, and at all times relevant hereto has been, an individual who is a citizen of and/or who is engaged in doing business in the County of Los Angeles, State of California, and transacts business in Montgomery and Harris Counties, Texas.

7.     Defendant Chad Hayes is, and at all times relevant hereto has been, an individual who is a citizen of and/or who is engaged in doing business in the County of Los Angeles, State of California, and transacts business in Montgomery and Harris Counties, Texas.

8.     Defendant Carey Hayes is, and at all times relevant hereto has been, an individual who is a citizen of and/or who is engaged in doing business in the County of Los Angeles, State of California, and transacts business in Montgomery and Harris Counties, Texas.

9.     Plaintiff is informed and believes and based thereon alleges that Defendant Warner Bros. Entertainment Inc. is a Delaware corporation with its principal place of business in Los Angeles County, California, and is a wholly owned subsidiary of Defendant Time Warner Inc.  Warner Bros. transacts business in Montgomery County, Texas.

10.     Plaintiff is informed and believes and based thereon alleges that Defendant New Line Productions, Inc. is a Delaware corporation with its principal place of business in Los Angeles County, California, and is a wholly owned subsidiary of Defendant Warner Bros.  New Line transacts business in Harris County, Texas.

11. Plaintiff is informed and believes and based thereon alleges that Defendant Time Warner Inc. is a Delaware corporation with its corporate headquarters in the State of New York. Time Warner is the parent company of Warner Bros. and New Line. Time Warner regularly conducts significant ongoing business in the State of Texas and in Harris County, Texas.

12. Plaintiff is informed and believes and based thereon alleges that Defendants Time Warner, Warner Bros. and New Line are, and at all times material hereto were, the alter-egos of each other and there exists and has existed at all times material hereto a unity of interest and ownership among such Defendants such that any separateness has ceased to exist in that Defendants, and each of them, used assets of the other Defendants, and/or each of them, for its and/or their separate, individual purposes, and caused valuable assets, property, rights and/or interests to be transferred to each other without adequate consideration

13. Plaintiff is informed and believes and based thereon alleges that each of the Defendants was the agent, partner, servant, employee, or employer of each of the other Defendants herein, and that at all times herein mentioned, each of the Defendants was acting within the course and scope of such employment, partnership and/or agency and that each of the Defendants is jointly and severally responsible for the damages hereinafter alleged.

## JURISDICTION AND VENUE

14. This is a civil action for copyright infringement and injunctive relief under the United States Copyright Act, 17 U.S.C. §§ 101 *et seq.* (hereinafter, "the Copyright Act"), for unfair competition under the Lanham Act, 15 U.S.C. § 1125(a), for declaratory relief under the Declaratory Judgment Act, 28 U.S.C. § 2201, and related state law claims.

- 4 -

15.     This Court has original subject matter jurisdiction over the claims set forth in this complaint pursuant to the Copyright Act, 17 U.S.C. § 101 *et seq.*, 28 U.S.C. §§ 1331, 1332, and 1338(a) and (b), and the Declaratory Judgment Act, 28 U.S.C.§ 2201.

16.     This Court has supplemental jurisdiction over the related state claims herein pursuant to 28 U.S.C. § 1367(a) in that these claims form part of the same case and controversy as the federal claims herein.

17.     This Court has general and specific personal jurisdiction over the Defendants in that: (i) Defendants are regularly doing business in the State of Texas and in this District, and have continuous and systematic contacts with the State of Texas; (ii) Defendants have previously submitted themselves to the jurisdiction of the Bankruptcy Court in Houston, Texas and also purposely availed themselves of the benefits and protections of Texas law by actively participating in a core proceeding in Mr. DeRosa-Grund's bankruptcy, during which they sought and obtained relief from the Bankruptcy Court; and (iii) a substantial portion of the relevant acts complained of herein occurred in the State of Texas and in this District, and the causes of action at issue in this lawsuit arise out of Defendants' contacts with the State of Texas.  Personal jurisdiction over the non-resident Defendants is proper because this lawsuit arises from, was connected with an act or transaction, and relates to the purposeful acts of the non-resident Defendants in Texas, and those purposeful acts are directed towards Texas.  The assumption of jurisdiction by this Court over the non-resident Defendants does not offend traditional notions of fair play and substantial justice.

18.     This Court has jurisdiction over the subject matter of this action under federal diversity jurisdiction, 28 U.S.C. § 1332, as the parties are completely diverse in citizenship and the amount in controversy exceeds $75,000.  This Court also has jurisdiction pursuant to 28

U.S.C. §§ 2201 *et seq*. (Declaratory Judgment Act), § 1331 (federal question), § 1338(a) (acts of Congress relating to trademarks), and § 1367 (supplemental jurisdiction over state claims).

19.     Venue is proper in the Southern District of Texas pursuant to 28 U.S.C. §1391(b)(2) because a substantial part of the events or omissions giving rise to the claims at issue in this lawsuit occurred in this District.

## CONDITIONS PRECEDENT

20.     All conditions precedent necessary to maintain this action have been performed, have been waived, or have occurred.

## FACTUAL ALLEGATIONS

21.     Plaintiff is a motion picture producer who lives and works in Montgomery County, Texas.

22.     Ed Warren and Lorraine Warren are well known paranormal investigators.

23.     Plaintiff has known Mr. Warren (now deceased) and Mrs. Warren for over two and a half decades.  Throughout that period Plaintiff held thousands of hours of discussions, the vast majority with Mr. Warren, regarding the Warren's paranormal investigation case files (the "Case Files").  During those discussions, Mr. Warren, in particular, would propose and discuss with Plaintiff various Case Files that he felt were particularly suitable for exploitation as a theatrical motion picture, and Mr. DeRosa-Grund would take notes and, on occasion, tape record the discussions.

24.     In or around early 1992, Plaintiff and Mr. Warren discussed a case of the Warren's relating to the Perron Farmhouse.  During this conversation, which was recorded, Mr. DeRosa-Grund revealed his strategy and vision to develop and produce a theatrical motion picture based on the Perron Farmhouse case.  It was this conversation, and, in particular,

Plaintiff's strategy and vision, that ultimately developed into, and became the basis for, Mr. DeRosa-Grund's The Conjuring Treatment.[1]

25.     Plaintiff wrote the "The Conjuring Treatment" as a work of fiction.   The Conjuring Treatment is a yarn about a family haunted by the spirit of a witch.   Unlike works of non-fiction surrounding historical and verifiable events there is no proof that any of the supernatural events in The Conjuring Treatment ever took place.   After Mr. DeRosa-Grund created, conceived, and authored The Conjuring Treatment, he intended to, among other things, create a series of supernatural/horror theatrical motion pictures as well as direct-to-video productions, a television series, and comic book series—all based upon The Conjuring Treatment.

26.     For a great many years after he wrote The Conjuring Treatment, Mr. DeRosa-Grund tried to sell the idea of a motion picture based on same to a number of Hollywood studios, without success.

27.     In January 2009, Plaintiff sent a copy of The Conjuring Treatment to Stacey Snider, the then-Chairwoman of DreamWorks.   In response, Ms. Snider advised Plaintiff that she "definitely understand[s] the commercial potential for such a deliciously creepy story."   However, due to an overabundance of paranormal material already in the DreamWorks development pipeline, The Conjuring Treatment did not fit into DreamWorks' plans at that time.

28.     Shortly thereafter, in or around early February 2009, Plaintiff sent a copy of The Conjuring Treatment to Gold Circle Films ("Gold Circle").   Gold Circle was interested in

---

[1]     As explained below, The Conjuring Treatment, which Plaintiff owns personally, was used without authorization by Defendants as the foundation and basis for the hit theatrical motion picture "The Conjuring," as well as its subsequently released theatrical motion picture "Annabelle," and the theatrical motion picture "The Conjuring 2" is now in pre-production and scheduled to commence principal photography on or about September 24, 2015.

entering into a deal with Plaintiff, whereby it would acquire the rights to The Conjuring Treatment, and also have Plaintiff write the script for the motion picture based on same.  Gold Circle issued a formal written term sheet to Plaintiff for Gold Circle's acquisition of the rights to Plaintiff's The Conjuring Treatment and his script writing services; however, the two sides could not ultimately agree to terms.

29.     Without Plaintiff's knowledge or permission, Defendant Safran, who Plaintiff had never met, obtained a copy of The Conjuring Treatment from Gold Circle.

30.     Defendant Safran then gave a copy of Plaintiff's The Conjuring Treatment to two screenwriters he knew, Chad Hayes and Carey Hayes.  The Hayes brothers have acknowledged that they took Plaintiff's The Conjuring Treatment, read it, and then decided to embark on writing a motion picture script based on Plaintiff's The Conjuring Treatment.  Specifically, in a published article as part of Defendants' official "press junket" in advance of the release of The Conjuring Film, Chad Hayes acknowledged that the Hayes brothers: (i) obtained the Plaintiff's The Conjuring Treatment from Mr. Safran, (ii) read and liked The Conjuring Treatment, and (iii) in writing their script based on The Conjuring Treatment, they changed the point of view of the story from that of the family being haunted (as in the Plaintiff's The Conjuring Treatment) to that of the paranormal investigators.  In an article in Collider from 2013, Chad Hayes states:

> We switched it off, the – Peter Safran, through a management company, sent us a treatment [Plaintiff's The Conjuring Treatment] for a story that was about the Perrons.  And it was scary, but Carey and I were like: "We've sort of seen it." The Warrens were mentioned, but just sort of as investigators, and we were familiar with them, and we went: "I wonder if we can switch the POV of this movie." Because what scares the investigators is really interesting…

31.     Through their own published statements, Defendants Hayes admit to having both access to Plaintiff's The Conjuring Treatment, physically copying and then, in turn, knowingly

and willfully making a work derivative of Plaintiff's The Conjuring Treatment.  However, Defendants Safran, Chad Hayes and Carey Hayes at no time obtained from Plaintiff the rights to make any derivative work of Plaintiff's The Conjuring Treatment, in violation of Plaintiff's copyrights in same.

32.     On January 27, 2012, Defendants New Line, Mr. Safran, Chad Hayes, and Carey Hayes, along with Plaintiff, as part of his bankruptcy proceeding, requested that the Bankruptcy Court, exclude a certain single intellectual property from Mr. DeRosa-Grund's bankruptcy estate. The only intellectual property Defendants sought to exclude from the bankruptcy estate was the Perron Life Rights.  The Bankruptcy Court's order excluding the Perron Life Rights did not exclude The Conjuring Treatment from the bankruptcy estate, nor did it provide any of the Defendants the right to make derivative works based on Plaintiff's The Conjuring Treatment.

33.     On October 7, 2010, Plaintiff wrote Craig Alexander, Head of Business Affairs for Defendant New Line, to advise him that the script for The Conjuring Film that New Line received from Chad and Carey Hayes was derived directly from Plaintiff's The Conjuring Treatment—the rights to which none of the Defendants had ever obtained any derivative rights from Plaintiff.  Specifically, Mr. DeRosa-Grund informed Mr. Alexander that "…at least 60%-65% of the story, if not more, is from my treatment."

34.     On October 7, 2010, Craig Alexander replied, "I'm afraid I can't buy your treatment I don't think the writers ever saw it…"

35.     Mr. Alexander correctly stated that New Line did not then, nor at any time, purchase any derivative rights to Plaintiff's The Conjuring Treatment.  However, he incorrectly stated that the writers (i.e., Chad and Carey Hayes) never read Plaintiff's The Conjuring

Treatment, as contradicted and fully evidenced by Defendant Chad Hayes and Defendant Safran's own published interview statements.

36.     Shortly thereafter, Defendants willfully excluded Plaintiff out of the creative process for The Conjuring Film, and did not provide him access to any pre-release screening for same.  It was not until Plaintiff saw the final entire The Conjuring Motion Picture for the first time, at the premier of same on or about, June 6, 2013, that Plaintiff could confirm Defendants use of his The Conjuring Treatment without their obtaining any derivative rights for same in violation of Plaintiff's copyright to his The Conjuring Treatment.

37.     Plaintiff then sought help to resolve the issue with Defendants through the Writers Guild of America ("WGA"), as Defendants Warner Brothers and New Line are signatories thereof under a collective bargaining agreement covering writers.  It was not until June 26, 2014 that the WGA made a final determination that it could not commence an action for resolution of any claims related to The Conjuring Treatment against Defendants on behalf of Plaintiff because Plaintiff was not a "professional writer," as defined by the WGA.

38.     New Line produced the theatrical motion picture, "The Conjuring," and released The Conjuring Film on or around July 19, 2013.  The Conjuring Film was hugely successful, grossing over $318,000,000 worldwide to-date.  With a production budget of approximately $20,000,000, "The Conjuring" theatrical motion Picture has been reported to be one of the most profitable theatrical motion picture films of 2013.

39.     A review of the Defendants' shooting script authored by Defendants Chad and Carey Hayes for The Conjuring Film (the "Shooting Script") reveals glaring and substantial similarities to Plaintiff's The Conjuring Treatment, including:

- 10 -

| PLAINTIFF'S "THE CONJURING" TREATMENT (1992) | THE CONJURING FILM / SHOOTING SCRIPT (2013) |
|---|---|
| A.    An unsuspecting family moves from the city to a rural Rhode Island farmhouse where the family becomes terrorized by the spirit of witch and a local Satanist who both want the family out of the house. Ultimately the family is placed in mortal danger when the spirit of the witch possesses the mother of the family. | An unsuspecting family moves from the city to a rural Rhode Island farmhouse where the family becomes terrorized by the spirit of witch who wants the family out of the house. Ultimately the family is placed in mortal danger when the spirit of the witch possesses the mother of the family. |
| B. As the Perron family start to move in to the farmhouse, the Peron's family pets, a cat and a dog, refuse to cross the threshold into the home. The cat has to be carried in and the dog dragged by the collar. | After the Perrons finish unpacking the family dog starts barking madly and refuses to come into the home. |
| C. Roger Perron immediately dismisses the family's concern saying that they are just not used to being out in the country. (This never | Roger Perron immediately dismisses his wife's concerns by saying it will take her time to get used to country living as she is a city girl. |

| | |
|---|---|
| happened and the event is totally constructed from Plaintiff's imagination as are a great number of the events in Plaintiff's treatment. Again this is not one shred of evidence that any of the events described ever happened.) | |
| D. After several months of calm things slowly begin to happen in the house. A number of old fashioned wind up "Regulator" clocks would be wound every day and reset to the correct time; but every night they would all strangely stop at the same time… 5:15. | After two months of calm things slowly begin to happen in the house. A number of old fashioned wind up clocks would be wound every day and reset to the correct time; but every night they would all strangely stop at the same time… 3:07. |
| E. Other phenomenon is directed exclusively at the Perron children, who have feelings of being "watched". | Other phenomenon is directed exclusively at the Perron children, who have feelings of being "watched". |
| F. Roger is at a loss to rationally explain is why everyone finds the house constantly cold. | The family is at a loss to explain why everyone finds the house constantly cold. |
| G. The next morning they find the girls pet rabbit with its throat slit. | The next morning they find the girls pet dog strangled on its own chain. |

| | |
|---|---|
| H. Doors begin to repeatedly open themselves, even after being tied down. | At night doors begin to repeatedly open themselves, even after being tied. |
| I. The presence of the spirit of the witch is always preceded and evidenced by a foul putrid stench like rotting meat. | The presence of the spirit of the witch is always preceded and evidenced by a foul putrid stench like rotting meat. |
| J The piano starts playing by itself in the middle of the night. | One night Caroline hears the piano plays three off-key notes by itself. |
| K. Roger is now, for the first time, himself the subject of the manifestations as he nearly "jumps out of his skin" when "touched" by an "icy hand" while working in the cellar. | Caroline nearly jumps out of her skin when she herself is the subject of the manifestations when disembodied hands reach out of the darkness and clap behind her while in the cellar. |
| L. Caroline reaches out to the Warrens help. | Caroline reaches out to the Warrens for help. |
| M. The Warrens are lecturing in Salem, Mass. on Halloween when they get the call from Carolyn Perron for the first time. | The Warrens are lecturing in Amherst, Mass. on Halloween when they get they meet Caroline Perron in person for the first time. |

| | |
|---|---|
| N. The Warrens go to the Perron House to investigate. Bring with them a researcher who records everything through the lens of his camera. (No film or video was ever taken by the Warrens – completely fabricated). | The Warrens go to the Perron House to investigate. Bring with them a researcher who records everything through the lens of his Bolex film camera. |
| N. The Catholic Church cannot help the Perrons with the demon in their house. | The Catholic Church refuses to help the Perrons with the demon in their house. |
| O. Bathsheba Sherman, whose demonic sprit haunts the Perron family runs out to the barn, climbs up into the rafters, just before hanging herself she publically proclaims her love of Satan and places a curse on all her relatives, and any other person that, would try to take her land, then hangs herself at 5:15 - The same time the clocks stop every night. | Bathsheba Sherman, whose demonic sprit haunts the Perron family runs out to a tree, climbs up, proclaims her love to Satan, curses anyone who tries to take her land, then hangs herself at 3:07 in the morning - The same time the clocks stop every night. |
| P. Judson catches Bathsheba sacrificing their infant daughter to Satan on the hearthstone of the fireplace inside the farmhouse. (Completely fabricated.) | Jedson catches Bathsheba sacrificing their infant daughter in front of the fireplace. |

| | |
|---|---|
| Q. The Warrens hold a séance to "cleanse: the Perron home. | The Warrens hold an exorcism to "cleanse" the Perron home |
| R. Ed's game plan is simple since the Church wont he will use religious provocation to get the spirit of Bathsheba to reveal herself so they can get it out of the house. Bathsheba's spirit possesses Caroline Perron. | The spirit of Bathsheba possesses Caroline. Since the Church won't help Ed conducts and exorcism in the basement to get Bathsheba to reveal herself so they can get her spirit out of the Caroline Perron. |
| S. The idea here, and for all of the supernatural sequences, is to employ as little special effects as possible. | The director of uses as little special effects as possible for all the supernatural sequences. |
| T. As Ed incites the Catholic ritual, Bathsheba's spirit creates violent maelstrom of manifestations in the room. Carolyn's body jerks with violent spasms. | Ed incites the *Roman Ritual* and Bathsheba's spirit creates violent maelstrom of sound and chaos in the room. Carolyn's body contorts in a way that's not humanly possible. |
| U. Rogers fears for his wife. He yells at Lorraine to stop everything. Lorraine tries to calm him, to no avail. Ed says they can't stop at this point, there is no turning back | Rogers fears for his wife. He yells at Lorraine to stop it, they are killing her. Lorraine says they cannot stop now. |

| | |
|---|---|
| V. Lorraine implores Caroline to fight Bathsheba's spirit from possessing her. | Roger implores Caroline to fight Bathsheba's spirit from possessing her. |
| W. Carolyn come out of the grip of the possession and is surrounded by the girls who are simultaneously crying and hugging her. (Totally made up by Plaintiff.) | Carolyn comes out of the grips of possession, makes eye contact with the girls.  Tears of joy begin to flow, as she hurries down the steps to greet her girls who are all running toward her. |
| X. Closing: The screen now is filled with a montage of historical documents. | Closing: The screen now is filled with a montage of real articles and photographs of the real Perrons and the Warrens |

40.     Plaintiff is informed and believes, and Defendants have stated, that Defendants intend to produce a theatrical motion picture sequel to The Conjuring Film.  Defendants have announced a release date of October 23, 2015 as well as a start date of September 24, 2015.

41.     In addition to the foregoing direct copyright infringement of Plaintiff's The Conjuring Treatment by Defendants, a review of the Shooting Script also reveals glaring and substantial similarities to the original expression of the sequence of events as delineated in Plaintiff's The Conjuring Treatment.  Set forth below are some of the more obvious similarities:

| SEQUENCE OF EVENTS SIMILARITIES | |
| --- | --- |
| PLAINTIFF'S "THE CONJURING" TREATMENT (1992) | THE CONJURING FILM / SHOOTING SCRIPT (2013) |
| A. OPENING CREDITS | OPENING CREDITS |
| B. Perron Family moves from the city to the Farmhouse in the country. | Perron Family moves from the city to the Farmhouse in the country. |
| C. Perron Family Dog refuses to cross threshold into house. | Rogers goes down into basement for first time. |
| D. Rogers goes down into basement for first time. | Perron Family Dog refuses to cross threshold into house. |
| E. Several Month Pass | Two  Months Pass |

| | |
|---|---|
| F. Strange things start to happen to family | Strange things start to happen to family |
|     1. Clocks all stop at 5:15 every night |     1. Clocks all stop at 3:07 every night |
|     2. Children feel watched while sleeping |     2. Children feel watched while sleeping |
|     3.  Doors start opening and banging |      Kitchen door opens and bangs three |
|       three times on own. |      Times on its own, |
| | |
| G. Strange things turn darker, more serious | Strange things turn darker, more serious |
|     1. Piano plays middle of night |     1. Piano plays middle of night |
|     2. Pet rabbit throat slit |     2. Pet rabbit throat slit |
|     3. Roger touched by icy hand in |     3. Roger touched by icy hand in |
|      Basement |      Basement |
| | |
| H. Caroline woken up by foul putrid stench at 3AM | Christine and Nancy woken by foul smell at 3:07 AM |
|     1. Sees black mist rising from dresser |     1. Shadow Ghost (Bathsheba) appears |
|     2. Shadow Ghost (Bathsheba) appears |      for the first time. |
|      for the first time. | |
| | |
| I. Carolyn Perron starts to mentally change as she is possessed by the spirit of Bathsheba. | |

| | |
|---|---|
| J. Carolyn reaches out to Ed and Lorraine Warren for help. | Carolyn reaches out to Ed and Lorraine Warren for help. |
| K. Ed and Lorraine Warren are lecturing at University of Salem when they get the call from Carolyn. | Ed and Lorraine Warren are lecturing at University of Amherst when they get the call from Carolyn. |
| L. The Warrens go to the farmhouse to meet the Perron Family and see what is happening to the family. | The Warrens go to the farmhouse to meet the Perron Family and see what is happening to the family. |
| M. The Warrens ask the local Catholic Diocese to help the family. | The Warrens ask the local Catholic Diocese to help the family. |
| N. The Diocese is not able to help fix the demonic infestation the Perrons are suffering. | The local Diocese refuses to get involved |
| O. Since the Church won't help The Warren's decide to hold a religious provocation in the house to cleanse it of the demonic spirit. | Since the Church won't help The Warren's decide to hold an exorcism in the house to cleanse it of the demonic spirit. |

| | |
|---|---|
| P. The religious provocation takes place in the basement of the Perron farmhouse. | The exorcism provocation takes place in the basement of the Perron farmhouse. |
| Q. The religious provocation goes wrong and Carolyn becomes possessed. | The exorcism goes wrong and Carolyn becomes possessed. |
| R. Ed now switches to a right of Deliverance to get the demon out of Carolyn. | |
| S. All hell breaks loose. | All hell breaks loose. |
| T. Carolyn under possession talks in a strange voice and her body jerks with violent spasms. | Carolyn under possession talks in a strange voice and her body jerks with violent spasms. |
| U. Roger tries to stop the proceeding. Lorrain tells him they can't turn back. | Roger tries to stop the proceeding. Lorrain tells him they can't turn back. |
| V. Loraine implores Carolyn to fight the demonic spirit within her. | Loraine implores Carolyn to fight the demonic spirit within her. |

| | |
|---|---|
| W. Carolyn fights back against the spirit and the deliverance is successful. | Carolyn fights back against the spirit and the deliverance is successful. |
| X. The maelstrom created by the demonic spirit subsides. | The maelstrom created by the demonic spirit subsides. |
| Y. The Perron girls surround Carolyn and hug her while tears stream down their faces. | The Perron girls surround Carolyn and hug her while tears stream down their faces. |
| Z. Family moves out. | Family moves out. |
| AA. Fade to black. | Freeze Fame. |
| BB. Scene back in Perron's house to let audience know -- it is not over.  Bathsheba is still there. | Scene back in Warren's house to let audience know -- it is not over.  Bathsheba is still there. |

42.    The sequence of events, as delineated in the Shooting Script, is remarkably similar to the sequence of events originally depicted in Plaintiff's The Conjuring Treatment. These similarities are not surprising given the Hayes brothers' admissions that they: (i) obtained the Plaintiff's The Conjuring Treatment from Mr. Safran, (ii) read and liked Plaintiff's The Conjuring Treatment; and (iii) in writing their script based on The Conjuring Treatment, they

simply changed the point of view of the story from that of the family being haunted (as in the Plaintiff's The Conjuring Treatment) to that of the paranormal investigators.

43.     In an email sent by Mr. Safran to his attorney, which his counsel then forwarded to New Line's business affairs department during The Conjuring deal negotiations, Mr. Safran claims that he must be attached to any and all subsequent production as *he* was the one who created the point of entry of the Warrens into the sequence of events that made up The Conjuring story.  Mr. Safran may be correct that the person who conceived the Warren's point of entry into the story was critical and thus warranting an unending attachment of that person as a producer to all subsequent productions. However, the previously incorporated charts evidence that the person who actually created and conceived of the particular point of entry of the Warrens into the story was Plaintiff. The Warrens point of entry was delineated in Plaintiff's prior written treatment and then copied, without change, by Defendants Hayes in the Shooting Script as delineated in the charts above.

44.     As recently as August 4. 2015, Defendants Hayes are offering writing workshops through the Writer's Store where they claim they are the sole writers of The Conjuring. The offering sent out on the Internet for the Hayes' workshop to be held on August 15, 2015 at the Westin LAX, Los Angeles, California (at a cost of $299.99 per person) states that:

> *Since writing 2013's breakout hit THE CONJURING, they have been in high demand...*

and;

> **Topics Covered will Include:**

> *The importance of an outline*
> *How to build on an idea*
> *Structuring a story*

Unfortunately nowhere in the offering do the Hayes brothers state the truth: that they used Plaintiff's treatment, story and outline to create the script they inappropriately claim in said ad they did by themselves without Plaintiff's The Conjuring Treatment.  While Chad and Carey Hayes take credit as being sole writers, they are not.  Defendant New Line is also aware of this falsity.

### COUNT I: COPYRIGHT INFRINGEMENT 17 U.S.C. §§ 101 *et seq.*,

45.    Plaintiffs incorporate herein, by reference, the same as if set forth at length verbatim, the factual allegations contained hereinabove.

46.    The Conjuring Film, and the Screenplay on which it is based, are wholly original works and copyrightable subject matter under the laws of the United States.

47.    Plaintiff applied for copyright registration for his The Conjuring Treatment on June 13, 2015 with the US Copyright Office under case number 1-2551067721.

48.    Plaintiff personally, reserved, retained, and owns the exclusive theatrical motion picture sequel rights and television rights to The Conjuring Treatment and all other ancillary rights thereto.

49.    As the sole proprietor of theatrical motion picture and ancillary rights under the copyright of The Conjuring Treatment, Plaintiff has the exclusive rights, to among other things; prepare derivative works based on The Conjuring Treatment or to license to others the rights to do so.

50.    By their production and release of The Conjuring Film, a motion picture indisputably derived from Plaintiff's The Conjuring Treatment, Defendants knowingly and willfully infringed, and will continue to infringe, Plaintiff's copyrights and rights under copyright in The Conjuring Treatment.

- 23 -

51.     Plaintiff placed Defendants on notice of their infringement, yet Defendants willfully continue to infringe Plaintiff's rights under copyright, in disregard of and indifference to Plaintiff's rights.

52.     As a direct and proximate result of Defendants' copyright infringement, Plaintiff has suffered and will continue to suffer severe injuries and harm, much of which cannot be reasonably or adequately measured or compensated in money damages if such wrongful conduct is allowed to continue unabated.  The ongoing harm this wrongful conduct will continue to cause Plaintiff is both imminent and irreparable. Plaintiff's injuries and damages include, but are not limited to, loss of customers, dilution of goodwill, injury to his reputation, and diminution of the value of his intellectual property.

53.     Pursuant to 17 U.S.C. § 502, Plaintiff is entitled to a preliminary injunction, during the pendency of this action, and to a permanent injunction enjoining Defendants, their officers, agents and employees, and all persons acting in concert with them, from engaging in such further violations of The Copyright Act.

54.     Plaintiff is further entitled to recover from Defendants the damages, including pre-judgment interest it sustained and will sustain, and any income, gains, profits, and advantages obtained by Defendants as a result of their wrongful acts alleged hereinabove, in an amount which cannot yet be fully ascertained, but which shall be assessed at the time of trial. Plaintiff is further entitled to his attorney's fees and full costs pursuant to 17 U.S.C. 24 § 505.

## COUNT II: VIOLATION OF THE LANHAM ACT § 43(a), 15 U.S.C. § 1125, UNFAIR COMPETITION

55.     Plaintiff incorporates herein, by reference, the same as if set forth at length verbatim, the factual allegations contained hereinabove.

56.     Plaintiff is informed and believes and thereon allege that Defendants have and continue to willfully misrepresent in their commercial advertising and promotional materials the origins of The Conjuring Film, ignoring Plaintiff The Conjuring Treatment upon which such derivative works are actually based, all with an intention to mislead and misrepresent the nature, characteristics and qualities of Defendants' goods, services or commercial activities.

57.     As a result of such false and misleading designation, marketing and advertising, members of the public who view The Conjuring Film, Defendants produced first subsequent motion picture production thereto (i.e., Annabelle) and the Defendant's announced The Conjuring 2 motion picture, who purchase other derivative works and who view New Line, Warner Bros. and Time Warner Internet sites and other advertising and promotional materials are likely to be confused about the true nature, characteristics and qualities of the products they are consuming.

58.     Plaintiff is informed and believes and thereon alleges that Defendants, notwithstanding their knowledge to the contrary, falsely represented to third parties that they have the rights to exploit theatrical motion picture and ancillary rights to the material on which The Conjuring Film is based and willfully omitted disclosure of the true status of such rights to such third parties, and that based upon such false claims, representations and omissions Defendants have induced such third parties to enter into agreements with them, including but not limited to agreements to develop, produce and distribute The Conjuring Film, its subsequent

productions and to license ancillary derivative products based thereon, all of which is derived from Plaintiff's The Conjuring Treatment.

59.     Plaintiff is informed and believes and thereon alleges that Defendants used such misrepresentations and omissions in interstate commerce in order to induce others to enter into contracts or other forms of business arrangements with Defendants. Such actions constitute the use of false description or representation in interstate commerce, likely to cause confusion, mistake or to deceive and is in opposition to the protection of the public interest.

60.     Defendants will likely continue such misrepresentations and omissions, thus wrongfully misappropriating and encumbering Plaintiff's rights to the use and enjoyment of their intellectual property and the goodwill attendant thereto, and resulting in likely confusion of and a fraud on the public

61.     As a direct and proximate cause of Defendants' unfair trade practices and unfair competition, Plaintiff has suffered and will continue to suffer severe injuries and harm, much of which cannot be reasonably or adequately measured or compensated in damages if such wrongful conduct is allowed to continue unabated. The ongoing harm this wrongful conduct will continue to cause Plaintiffs is both imminent and irreparable. Plaintiff's injuries and damages include but are not limited to loss of fair compensation for its intellectual property, loss of customers, dilution of goodwill, injury to their business reputation, and diminution of the value of their intellectual property.

62.     By reason of the foregoing, Defendants have violated and continue to violate the Lanham Act, 15 U.S.C. § § 1117 and 1125.

63.     Plaintiff is entitled to an injunction, during the pendency of this action, and permanently (i) enjoining Defendants, their officers, agents and employees, and all persons

acting in concert with them, from engaging in such further violations of the Lanham Act, 15 U.S.C. §§ 1117 and 1125.

64.     Plaintiff has no adequate remedy at law with respect to these ongoing violations.

65.     Plaintiff is further entitled to recover from Defendants the damages, including attorneys' fees and costs, he sustained and will sustain, and any income, gains, profits, and advantages obtained by Defendants as a result of their wrongful acts and omissions alleged hereinabove, in an amount which cannot yet be fully ascertained, but which shall be assessed at the time of trial.

66.     Plaintiff is informed and believes and thereon alleges that Defendants' wrongful conduct, acts and omissions were conducted in an intentional, callous, and calculated manner in conscious disregard for Plaintiff's rights, health and feelings, and knowingly and intentionally injured and damaged Plaintiff, which conduct constituted oppression and malice as defined by Chapter 41 of the Texas Civil Practice and Remedies Code, and in accordance therewith, Plaintiff is entitled to punitive damages in an amount sufficient to punish Defendants, to be assessed at trial.

## COUNT III: COMMON LAW MISAPPROPRIATION AND UNFAIR COMPETITION;

67.     Plaintiff incorporates herein, by reference, the same as if set forth at length verbatim, the factual allegations contained hereinabove.

68.     In addition to the wrongful acts and omissions alleged hereinabove and incorporated herein, Plaintiff is informed and Defendants Warner Bros. and New Line and their parent company, Defendant Time Warner, have intentionally omitted from Time Warner's Annual Reports on Form 10-K, Quarterly Reports on Form 10-Q. Current Reports on Form 8-K

and other publicly reported documents any and all mention that: (i) The Conjuring Film; (ii) the Annabelle subsequent production film thereof; or. (iii) The Conjuring 2 Film now in pre-production is based on the Plaintiff's The Conjuring Treatment or that Defendants lack the requisite rights to produce and distribute their: (i) The Conjuring Film; (ii) Annabelle subsequent production film thereof; or, (iii) The Conjuring 2 Film now in pre-production, even though such Defendants had actual and/or constructive notice of such facts. Such systematic public misrepresentations by omission are likely to deceive, cause confusion and mistake and run counter to the public interest.

69.     In addition to the wrongful acts and omissions alleged hereinabove and incorporated herein, Defendants wrongful conduct amounts to the bodily appropriation of The Conjuring Treatment and/or of rights therein and to "reverse passing off," depriving Plaintiffs of the full use and value of The Conjuring Treatment and of attendant goodwill, and resulting in likely confusion of and a fraud on the public. Defendants, unless restrained, have by their actions evidenced that they will continue to misrepresent and pass off the elements of The Conjuring Treatment as their sole property.

70.     Plaintiff created The Conjuring Treatment through extensive time, labor, skill and money.  Defendants have used that work in competition with Plaintiff thereby gaining a special advantage in that competition, and as a result, Plaintiff has sustained commercial damage, for which he seeks recovery herein for such misappropriation and unfair competition.

71.     As a direct and proximate result of Defendants' conduct, acts, and omissions alleged hereinabove, Plaintiff is entitled to recover his share of any income, gains, compensation, profits and advantages obtained, received or to be received by Defendants, or any of them, arising from the exploitation Plaintiff's rights in and the elements of The Conjuring Treatment;

and are entitled to an order requiring Defendants, jointly and severally, to render an accounting to ascertain the amount of such proceeds.

72.     As a direct and proximate result of Defendants' wrongful conduct, acts and omissions alleged hereinabove, Plaintiffs have been damaged, and Defendants will be unjustly enriched during the pendency of this action, in an amount that shall be assessed at trial for which damages and/or restitution and disgorgement is appropriate.  Such damages and/or restitution and disgorgement should include a declaration by this Court that Defendants are jointly and severally the constructive trustee for the benefit of Plaintiffs and an order that Defendants convey to Plaintiffs all Proceeds received by Defendants that are attributable to their wrongful exploitation of Plaintiff's The Conjuring Treatment.

73.     Defendants' wrongful conduct, acts and omissions have proximately caused and will continue to cause Plaintiffs substantial injury and damage including, without  limitation, loss of customers, dilution of goodwill, injury to Plaintiff's reputation, and diminution of the value of Plaintiff's rights.  The harm this wrongful conduct will cause to Plaintiffs is both imminent and irreparable, and the amount of damage sustained by Plaintiffs will be difficult to ascertain if such wrongful conduct is allowed to continue without restraint.

74.     Plaintiff is entitled to an injunction, during the pendency of this action, and permanently enjoining Defendants, their officers, agents and employees, and all persons acting in concert with them, from engaging in such further unfair business practices and unfair competition.

75.     Plaintiff is informed and believes and thereon alleges that Defendants' wrongful conduct, acts and omissions were conducted in an intentional, malicious, calculated and oppressive manner in conscious disregard for Plaintiff's rights, health and feelings, and

knowingly and intentionally injured and damaged Plaintiffs.  Plaintiff is entitled to punitive damages in an amount sufficient to punish Defendants, to be assessed at trial.

## COUNT IV: DECLARATORY RELIEF

76.    Plaintiff incorporates herein, by reference, the same as if set forth at length verbatim, the factual allegations contained hereinabove.

77.    By reason of the foregoing facts, an actual and justiciable controversy has arisen and now exists between Plaintiff and Defendants in that Plaintiff contends and Defendants deny that Defendants infringed and will continue to infringe on Plaintiff's copyright under Federal copyright law, 17 U.S.C. §§ I 0 l et seq.

78.    Plaintiff desires a judicial determination of this issue.

79.    A declaration of the Court is necessary and appropriate pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201 *et seq*., so that Plaintiff may ascertain his rights with respect to Defendants': (i) The Conjuring Film; (ii) the Annabelle subsequent production film thereof; and (iii) The Conjuring 2 Film.

## COUNT V: INJUNCTIVE RELIEF

80.    Plaintiff incorporates herein, by reference, the same as if set forth at length verbatim, the factual allegations contained hereinabove.

81.    Unless enjoined and restrained by order of the Court, Defendants' conduct will infringe Plaintiff's copyrights and interests.

82.    By reason of Defendants' ongoing or imminent copyright infringement and Defendants' unfair trade practices and unfair competition against Plaintiff, Plaintiff has sustained and, unless and until Defendants are enjoined, will continue to sustain substantial imminent and irreparable injury, loss and damage, including repeated infringement of their copyrights and

interests, diminution of the value of their copyrights and interests, loss of customers, dilution of goodwill, and injury to their business reputation.

83.     Plaintiff has no adequate remedy at law for many of his injuries in that such injuries cannot be reasonably, adequately or precisely measured or compensated in damages if such wrongful conduct is not restrained and allowed to continue unabated.

84.     Plaintiff is entitled to a preliminary injunction during the pendency of this action and a permanent injunction ordering that Defendants, their agents, employees, licensees and assigns be enjoined from producing, reproducing, distributing and exploiting or authorizing the production, reproduction, distribution or exploitation of the Defendants': (i)The Conjuring Film; (ii) the Annabelle subsequent production film thereof; and (iii) The Conjuring 2 Film and any ancillary products based thereon, derived from Plaintiff's The Conjuring Treatment.

85.     Plaintiff is entitled to a preliminary injunction during the pendency of this action and a permanent injunction ordering that Defendants, their agents, employees, licensees and assigns be enjoined from claims that Chad and Carey Hayes are (i) the sole writers of The Conjuring Motion Picture; (ii) any credits to Chad and Carey Hayes on any subsequent production that they are the sole writers; (iii) any payments to Chad and Carey Hayes for any subsequent production predicated on the fact that they are the sole writers of The Conjuring Motion Picture; and (iv) Chad and Carey Hayes holding representing themselves in any commercial endeavor or enterprise; including but not limited to credits in unrelated productions and writing seminars as "The writers of The Conjuring" or words substantially similar to,

## RELIEF REQUESTED

86.     WHEREFORE, Plaintiff, Tony DeRosa-Grund, requests that this Court grant the following relief, jointly and severally, against Defendants, New Line Productions, Inc., Warner

Bros. Entertainment, Inc., Time Warner Inc., Chad Hayes, Carey Hayes, and Peter Safran, as follows:

ON THE FIRST CLAIM FOR RELIEF

87.    For an order preliminarily during the pendency of this action and thereafter, permanently, (i) enjoining Defendants, their officers, agents, employees, licensees and assigns, and all persons acting in concert with them, from infringing the copyrights in The Conjuring Treatment, in any manner, and (ii) enjoining Defendants, their officers, agents, employees, licensees and assigns, and all persons acting in concert with them, from engaging in or authorizing the production, reproduction, distribution and/or exploitation of the infringing: (i) The Conjuring Film; (ii) the Annabelle subsequent production film thereof; and (iii) The Conjuring 2 Film and ancillary products based thereon, derived from The Conjuring Treatment, without Plaintiff's express written consent;

88.    For compensatory and consequential damages, according to proof in an amount determined at trial, together with interest thereon as provided by law;

89.    For an accounting and restitution to Plaintiffs of all gains, profits and advantages Defendants have derived from their production, distribution and exploitation of: (i) The Conjuring Film; (ii) the Annabelle subsequent production film thereof; and (iii) The Conjuring 2 Film, and ancillary exploitations based thereon, and from their copyright infringement of The Conjuring Treatment; and

90.    For such other and further relief and remedies available under the Copyright Act, 17 U.S.C. §§ 101 *et seq.*, which the Court may deem just and proper.

<u>ON THE SECOND CLAIM FOR RELIEF</u>

91.     For an order preliminarily during the pendency of this action and thereafter permanently enjoining Defendants, their officers, agents, employees, licensees and assigns and all persons acting in concert with them, from engaging in such further violations of the Lanham Act, 15 U.S.C. §§ 1117 and 1125, as alleged herein above;

92.     For treble compensatory and consequential damages according to proof in an amount to be determined at trial;

93.     For such other and further relief and remedies available under the Lanham Act, 15 U.S.C. § 1125, which the Court may deem just and proper; and

94.     For punitive and exemplary damages as may be awarded at trial.

<u>ON THE THIRD CLAIM FOR RELIEF</u>

95.     For the imposition of a constructive trust for the benefit of Plaintiffs on any and all unlawful proceeds received and to be received by Defendants;

96.     For restitution to Plaintiffs of any and all unlawful proceeds received and to be received by Defendants;

97.     For an order preliminarily during the pendency of this action and thereafter, permanently, enjoining Defendants, their officers, agents, employees, licensees and assigns, and all persons acting in concert with them, from engaging in such further unfair business practices and unfair competition under the common law, as alleged hereinabove;

98.     For compensatory and consequential damages according to proof in an amount to be determined at trial; and

99.     For such other and further relief and remedies which the Court may deem just and proper.

## ON THE FOURTH CLAIM FOR RELIEF

100.    For punitive and exemplary damages as may be awarded at trial.  For an order preliminarily during the pendency of this action and thereafter, permanently, (i) enjoining defendants, their officers, agents, employees, licensees and assigns, and all persons acting in concert with them, from infringing the copyrights in The Conjuring Treatment, in any manner, and (ii) enjoining Defendants, their officers, agents, employees, licensees and assigns, and all persons acting in concert with them, from engaging in or authorizing the development, pre-production and/or production, reproduction, distribution and/or exploitation of the infringing: (i) The Conjuring Film; (ii) the Annabelle subsequent production film thereof; and (iii) The Conjuring 2 Film (currently entitled The Conjuring 2: Enfield Poltergeist) and any and all ancillary products based thereon, derived from The Conjuring Treatment, without Plaintiff's express written consent.

## ON THE FIFTH CLAIM FOR RELIEF

101.    For a declaration:

    a.    That Defendants have by their foregoing acts infringed upon and are likely to continue to infringe upon the copyright of The Conjuring Treatment and Plaintiff's copyright interests therein;

    b.    That the development, preparation, production, reproduction, distribution and/or exploitation, by Defendants, their licensees and/or assigns of The Conjuring Film and further derivative works or product's based on The Conjuring Treatment, including, but not limited to, theatrical motion pictures, are prohibited as infringements of Plaintiff's copyrights; and

    c.    That Defendants had/have no authority to confer licenses or grants on others to reproduce, distribute or exploit The Conjuring Film or to prepare, distribute or exploit other derivative works or products derived from the Plaintiff's The Conjuring Treatment.

    d,    Plaintiffs, their agents, employees, licensees and assigns be enjoined from claims that Chad and Carey Hayes are (i) the sole writers of The

Conjuring Motion; (ii) any credits to Chad and Carey Hayes on any subsequent production that they are the sole writers; (iii) any payments to Chad and Carey Hayes for any subsequent production predicated on the fact that they are the sole writers of The Conjuring Motion Picture; and (iv) Chad and Carey Hayes holding representing themselves in any commercial endeavor or enterprise; including but not limited to credits in unrelated productions and writing seminars as "The writers of The Conjuring" or words substantially similar to,

<u>ON ALL CLAIMS FOR RELIEF</u>

102.   For Plaintiff's costs of suit;

103.   For interest at the highest lawful rate on all sums awarded Plaintiffs other than punitive damages;

104.   For reasonable attorneys' fees; and

105.   For such other and further relief as the Court deems just and appropriate.

**<u>DEMAND FOR A JURY TRIAL</u>**

106.   Plaintiff hereby demands a jury trial on issues so triable pursuant to Rule 38 of the Federal Rules of Civil Procedure.

Respectfully submitted,


By: ___*/s/ Sanford L. Dow*_____
            Sanford L. Dow
            Texas Bar No. 00787392
            S.D. Tex. ID No. 17162
            Nine Greenway Plaza, Suite 500
            Houston, Texas 77046
            (713) 526-3700/FAX (713) 526-3750

            ATTORNEY-IN-CHARGE FOR TONY
            DEROSA-GRUND

OF COUNSEL:

DOW GOLUB REMELS & BEVERLY, LLP
Stephanie A. Hamm
Texas Bar No. 24069841
S.D. Tex. ID No. 108779
Nine Greenway Plaza, Suite 500
Houston, Texas 77046
(713) 526-3700/FAX (713) 526-3750